**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO:**

**WILL ROSENZWEIG,**

        **Plaintiff,**

      **v.**

**TODD BLANCHE,**
**In his official capacity as Acting Attorney General of the**
**UNITED STATES DEPARTMENT OF JUSTICE**
**950 Pennsylvania Avenue, NW**
**Washington, D.C. 20530;**

**UNITED STATES DEPARTMENT OF JUSTICE**
**950 Pennsylvania Avenue, NW**
**Washington, D.C. 20530;**

**JASON A. REDING QUIÑONES,**
**In his official capacity as United States Attorney**
**for the Southern District of Florida**
**99 NE 4th St, Miami, FL 33132; and**

**OFFICE OF PERSONNEL MANAGEMENT**
**1900 E Street, NW, Washington, D.C. 20415,**

        **Defendants.**

_____/

**<u>COMPLAINT</u>**

The First Amendment forbids the government from making approved politics a qualification for public service. The Department of Justice did exactly that. Three hours after an online political commentator surfaced a blog that Plaintiff Will Rosenzweig had written as a private citizen, before he entered government, the Department summarily fired him from his position as a federal prosecutor. It did so two weeks before he was to try a multimillion-dollar Medicare fraud case. The removal memorandum gave no reason. Only one explains it.

The Department's conduct rests on a single premise: a citizen must forever refrain from criticizing the government and its leaders to remain eligible to serve it. That rule would force every American who might one day serve to choose between speaking freely now and working for the government later. Conditioning public employment on political loyalty, where a party card rather than merit opens the door to a government job, is a way of life in Havana and Caracas. It has no place here.

Plaintiff Will Rosenzweig brings this action to challenge his termination by the Department of Justice for a blog he published as a private citizen before he entered government service. He sues four defendants: (1) Acting Attorney General Todd Blanche, in his official capacity; (2) the United States Department of Justice; (3) Jason A. Reding Quiñones, United States Attorney for the Southern District of Florida, in his official capacity; and (4) the Office of Personnel Management. He brings claims for violations of the First Amendment (Count I), the separation of powers (Count II), the Privacy Act, 5 U.S.C. § 552a (Count III), the Fifth Amendment (Count IV), and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (Count V). He seeks, among other relief described below, reinstatement to his position as an Assistant United States Attorney, compensation for the monetary losses the termination caused, and attorney's fees and costs.

### Summary of the Case

1. In September 2025, Plaintiff Will Rosenzweig was a high-performing, trusted prosecutor assigned to the United States Attorney's Office for the Southern District of Florida ("USAO-SDFL"). With over five years of service in the Department of Justice, his work ethic had gained him the respect of his DOJ superiors and earned him consistent praise and awards. Having developed a knack for fraud cases, he was assigned to USAO-SDFL's Healthcare Fraud Unit and

regularly obtained convictions of defendants who stole from taxpayers and federal programs.  His work at DOJ resulted in millions of dollars' worth of restitution orders aiming to return stolen money to the American public.  He had no instances of misconduct and regularly received the highest ratings on his annual reviews.

2.      None of that mattered to Defendants.  They summarily fired him, not for his work, but for his words.  Specifically, Defendants fired him because nearly a decade prior—when he was a private citizen—he published a blog that included criticisms of President Trump.  At the time of his firing, the blog had been defunct for over six years.  In addition to being a flagrant First Amendment violation, Defendants' actions arose from an unsettling chain of events.

3.      At the time of his firing, Mr. Rosenzweig was the lead trial counsel in the criminal case of *United States v. Marcelo Kochen, et al*., No. 1:24-cr-20078-DPG (S.D. Fla.).  In 2024, a federal grand jury indicted the defendants in *Kochen* for a multiyear, multimillion-dollar Medicare fraud scheme.  The trial was complex, involving over 40 government witnesses and 400 potential government exhibits.  Jury selection was set for October 6, 2025.  By Friday, September 19, 2025, the government—through Mr. Rosenzweig—had already disclosed its trial exhibit and witness lists and was ready for trial.  With less than three weeks until jury selection and urgently seeking more time, the *Kochen* defendants sought a continuance.  The district court denied the request.

4.      Days later, on September 23, 2025, Mr. Rosenzweig was with his family out of state, observing Rosh Hashanah.  Unbeknownst to Mr. Rosenzweig, at approximately 3:45 p.m. that day, a right-wing online commentator began posting about him on the social media platform X to her roughly 600,000 followers.  Labeling her first post as "EXCLUSIVE," the commentator announced that Mr. Rosenzweig had previously authored an online blog that criticized President Trump.  She went on to assert that Mr. Rosenzweig was now "using government power to wage

3

LAWFARE against MAGA patriots." The post included a screenshot image of Mr. Rosenzweig's LinkedIn account, as well as a photograph of him accepting a DOJ award. The online commentator "tagged" the accounts of then-Attorney General Pam Bondi, then-Deputy Attorney General Todd Blanche, DOJ official Ed Martin, and the official account of USAO-SDFL, increasing the chances it would catch the tagged users' attention, and implored Defendants to fire Mr. Rosenzweig. The commentator account's "followers" include multiple DOJ officials, including Ms. Bondi and Mr. Martin, and an account that appears to be linked to one of the *Kochen* defendants.

5.      The commentator, based in Washington, D.C., had no known prior connection to SDFL. Nor would she have had any reason to know about the *Kochen* trial or that Mr. Rosenzweig was actively prosecuting a case. At the time of her post, DOJ had never published a press release on the case, and the indictment and pretrial proceedings went unreported in local and national media. Further, the blog referred to by the commentator had been defunct for nearly seven years, with no recent postings.

6.      Less than three hours after the post, at 6:29 p.m., Mr. Rosenzweig received an email to his personal account from DOJ's Justice Management Division ("JMD"). Attached to the email was a PDF memorandum titled "AG Memo – Rosenzweig Removal." The memorandum was signed by Ms. Bondi and dated the same day. The memorandum stated that "[p]ursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Department of Justice is hereby terminated, and you are removed from federal service effective immediately." It gave no reason.

7.      Mr. Rosenzweig's firing—occurring on the cusp of a major, multi-defendant criminal trial—threw USAO-SDFL's Healthcare Fraud Unit into a tailspin. The government scrambled to find a replacement for Mr. Rosenzweig. On September 25, 2025, it moved to

continue the trial, citing the loss of the "lead prosecutor" on a "very complex case" who had been "essential to the trial."  The *Kochen* defendants, who had pressed the district court for a continuance of the trial just one week earlier, now opposed the government's motion to continue and insisted that the case proceed to trial quickly.

8.      Defendants terminated Mr. Rosenzweig without cause, citing an Article II removal authority that purports to supersede the Bill of Rights.  His sudden firing benefited the *Kochen* defendants because it disrupted the government's case against them.  DOJ's actions effectively sabotaged its own criminal prosecution of a multimillion-dollar fraud case at the urging of a social media post.  In doing so, Defendants violated the rights guaranteed to Mr. Rosenzweig under the U.S. Constitution and federal law.

## THE PARTIES

9.      Plaintiff Will Rosenzweig served as an Assistant United States Attorney ("AUSA") in the Miami office of the United States Attorney's Office for the Southern District of Florida from September 2020 until September 2025, when Defendants terminated his employment unlawfully without advance notice or legal cause, and in contravention of the law.

10.      Defendant Todd Blanche is sued in his official capacity as the Acting Attorney General of the United States.  In June 2026, he was nominated by President Donald J. Trump to permanently serve in that position, subject to the advice and consent of the Senate.  Former Attorney General Pamela Bondi authorized the unlawful and unconstitutional actions taken against Mr. Rosenzweig by signing his termination letter.  Ms. Bondi has since been removed from her position.  The position of Attorney General is considered a principal officer, as that term is understood under Article II, Section 2 of the Constitution.

11.     Defendant the United States Department of Justice is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701.  DOJ controls its components, including the USAO-SDFL, and on information and belief, authorized the unlawful and unconstitutional actions taken against Mr. Rosenzweig.

12.     Defendant Jason A. Reding Quiñones is sued in his official capacity as the United States Attorney for the Southern District of Florida.  He was sworn in as United States Attorney on August 13, 2025.[1]  United States Attorney Quiñones was reportedly involved in discussions with Defendant Blanche, or individuals acting on his behalf, related to authorizing the unlawful and unconstitutional actions taken against Mr. Rosenzweig.  The United States has taken the position that United States Attorneys are inferior officers, as that term is understood under Article II, Section 2 of the Constitution.  *See, e.g., United States v. Comey*, 810 F. Supp. 3d 768, 771-72 n.1 (E.D. Va. 2025) ("The parties agree that U.S. Attorneys are inferior officers.").

13.     Defendant Office of Personnel Management ("OPM") is headquartered in Washington, D.C. and is an agency of the United States as defined by 5 U.S.C. § 701.  It is the "chief human resources agency and personnel policy manager for the Federal Government."[2]  On information and belief, OPM authorized the unlawful and unconstitutional actions taken against Mr. Rosenzweig by effectuating the termination of his pay and access to government systems and by administratively processing him for separation from the federal service.  On information and belief, OPM maintains personnel records of terminated federal employees like Mr. Rosenzweig.

---

[1] United States Attorney's Office, Southern District of Florida ("USAO-SDFL"), Press Release, *Jason A. Reding Quiñones Sworn in as United States Attorney for the Southern District of Florida* (Aug. 13, 2025), https://www.justice.gov/usao-sdfl/pr/jason-reding-quinones-sworn-united-states-attorney-southern-district-florida (last visited Aug. 5, 2026).

[2] United States Office of Personnel Management ("OPM"), *About Us*, https://www.opm.gov/about-us/ (last visited Aug. 5, 2026).

**JURISDICTION AND VENUE**

14.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff's causes of action arise under the Constitution and laws of the United States.   The Court also has jurisdiction over Plaintiff's Privacy Act claim under 5 U.S.C. § 552a(g)(1) and (g)(5).

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) and 5 U.S.C. § 703.  Venue for the Privacy Act claim is also proper because Plaintiff resides in this judicial district.  5 U.S.C. § 552a(g)(5).

16.     Sovereign immunity is waived under 5 U.S.C. § 702, which entitles Plaintiff to relief where Defendants acted unconstitutionally and beyond statutory authority.

**FACTS**

*Mr. Rosenzweig is an exemplary AUSA, regularly receiving "outstanding" ratings and other awards from his DOJ superiors.*

17.     Plaintiff Will Rosenzweig, a resident of Miami, Florida, served the United States as an AUSA at USAO-SDFL's Miami Office for five years, from approximately September 14, 2020, until September 23, 2025.  Mr. Rosenzweig left a lucrative career in private practice and moved with his family from Washington, D.C. to Florida, to pursue a career in public service.

18.     During approximately his first two years at USAO-SDFL, Mr. Rosenzweig worked in the Major Crimes Section, focusing on prosecutions involving felony firearm possession, robbery, drug distribution crimes, and small fraud cases.  In approximately November 2022, after distinguishing himself as a litigator in those cases, he transferred to USAO-SDFL's Economic and Environmental Crimes Section.  There, Mr. Rosenzweig was assigned to the section's Healthcare Fraud Unit.  On behalf of the United States, he secured convictions for schemes that stole tens of millions of dollars from Americans, resulting in significant criminal penalties for the perpetrators

and restitution orders that helped make the victims—often the federal Medicare and Medicaid programs, as well as the taxpaying public—whole. Mr. Rosenzweig also handled an array of other fraud cases, including those involving the Paycheck Protection Program and COVID-19 Economic Injury Disaster Loans.

19. Throughout his time at USAO-SDFL, DOJ awarded Mr. Rosenzweig multiple cash and "time off" awards for his exceptional performance.  Mr. Rosenzweig also consistently received "outstanding" marks on his performance evaluations—the highest possible rating.  During his periodic reviews, his supervisors' comments included, but were not limited to, the following:

- "Will was tremendously efficient in the management of his cases."

- "He has now become a truly outstanding courtroom advocate."

- "He is well-liked by colleagues and support staff, including by his trial partners. Will worked tirelessly on his cases and was always willing to help out others in the office."

- "Will is [a] formidable advocate in court and his written work is just as effective."

- "I am truly impressed at how quickly he has become such an incredible and effective prosecutor in all facets of the job. He is efficient, decisive, organized, and hardworking. He always employs appropriate investigative techniques, works through tough issues, and his work product is consistently impeccable."

- "Will always adheres to the highest standards of professional conduct . . . [r]egarding work ethic, Will is second to none."

- "Will is the consummate team player and works well with everyone."

- "Will's written work is consistently excellent."

20. Mr. Rosenzweig has never been accused of, let alone found to have committed, any form of misconduct while employed with DOJ.  He was granted a security clearance upon his appointment to DOJ and has never had any security issues.

8

21.     In December 2022, Mr. Rosenzweig received a Standard Form ("SF") 50 "Notification of Personnel Action" which confirmed a "Change in Tenure Group" to "Group 1." As defined by OPM in the context of reductions in force, Tenure Group 1 of the excepted service encompasses "permanent employee[s] whose appointment carries no restriction or condition such as conditional, indefinite, specific time limit, or trial period."  5 C.F.R. § 351.502(b)(1).  The "Remarks" section of the SF-50 indicated "TRIAL PERIOD COMPLETED."  When Mr. Rosenzweig joined DOJ in 2020, he understood he would undergo a probationary period before becoming a permanent DOJ employee.  This SF-50 appears to reflect his change in status from probationary to permanent, elevating him to a more protected status within OPM's tenure groups.

22.     At the time he was fired, Mr. Rosenzweig had just completed five years of federal service, which is the minimum amount of time that a federal employee must complete in order to be eligible for annuity under the Federal Employees' Retirement System ("FERS").  5 U.S.C. § 8410; 5 C.F.R. § 842.203.  His annual salary exceeded $1,000.

23.     In early August 2025, just weeks before his firing, USAO-SDFL's then-United States Attorney—elevated to the position by the Trump Administration and, later, further elevated to a leadership position within DOJ—personally notified Mr. Rosenzweig that he would be receiving a special parking spot due to his high performance.  At USAO-SDFL at that time, line prosecutors were not typically provided with free parking.  Mr. Rosenzweig understood the gesture to be a recognition of his high performance.  Mr. Rosenzweig soon received an access card to the parking spot from the office's head of security.

24.     In sum, Mr. Rosenzweig was and is known to his colleagues as a dedicated prosecutor and attorney.  He consistently received positive comments from both supervisors and coworkers and was regularly and formally recognized by DOJ for his outstanding performance as

an AUSA.   Accordingly, DOJ placed him in steadily greater positions of responsibility for increasingly serious and complex cases.  When offering Mr. Rosenzweig a position, DOJ never communicated anything about the possibility of a so-called "Article II" removal, and Mr. Rosenzweig was never informed of such an outcome.  He instead understood that, following a probationary period, he would convert to a permanent member of the excepted service as recognized by the Civil Service Reform Act ("CSRA").

25.     Notwithstanding Mr. Rosenzweig's demonstrated capabilities as a prosecutor, he spent his years as an AUSA at the end of a long chain of supervisors within DOJ.  None of the positions that Mr. Rosenzweig held as an AUSA afforded him the ability to set DOJ policy; his job instead was to implement the policies set by his superiors.

26.     Even on his own cases, he did not have approval authority for every prosecutorial or investigative function.  For example, the decision to use electronic surveillance in narcotics trafficking investigations required the approval of senior DOJ leaders who oversaw the Electronic Surveillance Unit at DOJ Headquarters.  In instances where Mr. Rosenzweig's cases involved tax crimes, he needed approval from DOJ's Tax Division before the case could be charged.  Likewise, when he handled investigations under the Export Control Reform Act, major case decisions needed to be approved by a specific subsection of DOJ's National Security Division.  In these and similar instances, Mr. Rosenzweig's work as a prosecuting attorney involved implementing decisions made by a chain of supervisors and approval authorities.  That chain stretched from the USAO-SDFL Deputy Chiefs, Section Chiefs, Criminal Division Chief, and United States Attorney in Miami, to various political appointees and the Office of the Attorney General in Washington, D.C.

***Mr. Rosenzweig is assigned as the lead prosecutor in* United States v. Kochen et al.**

27.     By 2023, DOJ had entrusted Mr. Rosenzweig with leading the investigation and prosecution against Marcelo Kochen, Michael Kochen, and Sandro Herek (collectively, the

"*Kochen* defendants").  On March 7, 2024, a grand jury in SDFL returned a 25-page, 17-count indictment against all three defendants.  The indictment alleged a yearslong Medicare fraud scheme that garnered the defendants more than $17 million in illegal payouts.[3]

28.     Mr. Rosenzweig, who had worked on the case for years, was designated as the lead counsel for the United States at trial.  The indictment was signed by the then-United States Attorney for SDFL, who had supervisory authority over all criminal and civil cases within the district.  As an AUSA, Mr. Rosenzweig handled the day-to-day prosecutorial requirements of the case, under the authority of the United States Attorney and with the assistance of co-counsel.  His co-counsel on the case was also his deputy chief, who was the head of the SDFL Healthcare Fraud Unit.  While his co-counsel provided supervision throughout the case, Mr. Rosenzweig handled the vast majority of the case's work, including securing the indictment and preparing for trial.  By September 2025, Mr. Rosenzweig was the best-placed prosecutor in SDFL to present the government's strongest case-in-chief at trial.

29.     On three separate occasions, the *Kochen* defendants, through their counsel, sought continuances for the trial.  Each time their motions were met without DOJ opposition.[4]  Eventually, the district court set jury selection for October 6, 2025.[5]

30.     On September 13, 2025, Marcelo Kochen's defense counsel contacted Mr. Rosenzweig and claimed that she needed to speak with him about "a matter of life and death."  Mr. Rosenzweig had subsequent phone calls with her, during which the defense attorney informed him that Marcelo Kochen was diagnosed with a serious form of cancer.  Mr. Rosenzweig expressed his

---

[3] *United States v. Kochen et al. ("Kochen")*, No. 1:24-cr-20078-DPG (S.D. Fla.), ECF No. 1.

[4] *Id.* at ECF Nos. 50, 54, 60, 61, 74, 81.

[5] *Id.* at ECF No. 81.

sympathy and indicated he would agree to a request to continue the trial for a later date based on the attorney's representations about his health but would oppose Mr. Kochen's case being severed from the other defendants.

31.     Before a court hearing on September 19, 2025, Mr. Rosenzweig had an interaction with Marcelo Kochen's defense counsel in which he observed her acting, in his estimation, oddly. Specifically, she approached Mr. Rosenzweig unprompted and attempted to confirm biographical information about him while offering superfluous pleasantries.  This stood out as unusual to Mr. Rosenzweig, since the two had interacted on this case for years and the defense attorney had never before shown this level of interest in his personal and professional background.  For example, intruding on a conversation between Mr. Rosenzweig and others about the upcoming Rosh Hashanah holiday, the attorney spontaneously brought up that she knew where Mr. Rosenzweig had lived and worked before he joined DOJ.  Mr. Rosenzweig had never shared these details with her before.  Further, those types of introductory-level niceties had never come up during the attorneys' countless prior exchanges throughout the case.  However, such details would have been available online to anyone who might have searched them out.

32.     At that same court hearing, Marcelo Kochen's defense attorney made an oral motion on the record to have her client's case severed and to continue the trial date for all defendants.  Mr. Rosenzweig informed the court that the government opposed a severance but had no objection to the continuance of the entire case, given the claims made about the health of one of the defendants.  Both of Marcelo Kochen's requests—the severance and the continuance—were provisionally denied by the district court.[6]

---

[6] *Id.* at ECF No. 192.

***Mr. Rosenzweig is summarily fired following a social media post by a right-wing commentator linked to one of the* Kochen *defendants.***

33.     On Tuesday, September 23, 2025, Mr. Rosenzweig, who is Jewish, traveled out of the district to celebrate Rosh Hashanah with his family.  As part of his observation of the holiday, he turned off his government laptop, phone, and other electronic devices.  With less than two weeks until jury selection in the *Kochen* case, he alerted his USAO-SDFL coworkers that he would be observing the holiday but planned to conduct minimal checks of his electronic devices in order to monitor for any urgent matters related to the trial that might arise while he was out.

34.     At or around 3:45 p.m. ET, a right-wing political commentator named Natalie Winters published an "EXCLUSIVE" post to her account on the social media website X.  The post announced that Mr. Rosenzweig had previously written about his disagreement with policies and rhetoric of the first Trump Administration and that he had published his thoughts on a blog.  On information and belief, labeling a post as "EXCLUSIVE" means that a publisher believes he or she is the first person to publicize specific news or information, because he or she is the only person with publishable knowledge of that news or information.

35.     Ms. Winters is a right-wing political commentator who runs a blog that purports to "expose the networks of corruption, foreign influence, and political deception hiding behind polished press briefings and filtered soundbites."[7]  She has a corresponding social media account on X with over 640,000 followers, as of the date of this filing.[8]  As of the date of this filing, one of those followers appears to be an account belonging to Sandro Herek, one of the three *Kochen*

---

[7] Natalie Winters, About, SUBSTACK, https://nataliegwinters.substack.com/about (last visited Aug. 5, 2026).

[8] Natalie Winters (@nataliegwinters), X, https://x.com/nataliegwinters (last visited Aug. 5, 2026).

defendants.[9] The profile photograph on the account appears to be the same person Mr. Rosenzweig had been prosecuting at the time he was fired.  The account "handle" is @HerekSandro.  The @HerekSandro account includes a tagline that reads: "Conservative, father, husband and always in a good mood. Family is everything. Against communism and socialism."  It is unknown how long the @HerekSandro account has been following Ms. Winters's account.



36.     Prior to her September 23, 2025 X postings, Ms. Winters had no apparent connection to SDFL, Mr. Rosenzweig, or the pending *Kochen* prosecution.  For example, on information and belief, Ms. Winters is currently based in or around Washington, D.C., has a limited professional background, and has no known previous interest in healthcare fraud cases in the Miami region.  And while the charges in the *Kochen* case were serious, the case garnered virtually no attention by the national or local media while it was being prosecuted by Mr. Rosenzweig.  In fact, DOJ itself did not even publish a press release following the grand jury's 2024 indictment.  There are no known records of DOJ ever publicizing the case to the media prior to Mr. Rosenzweig's termination.  In other words, short of a member of the media monitoring random SDFL criminal dockets or coincidentally appearing at the Miami federal courthouse on the exact

---

[9] Sandro Herek (@HerekSandro), X, https://x.com/HerekSandro (last visited Aug. 5, 2026).

date and time when a *Kochen* proceeding was occurring, the primary source from which a member of the public might have learned about the case would have been through one of the parties.

37.     Somehow, Mr. Rosenzweig's prosecution of the *Kochen* case came to Ms. Winters's attention.  In her first post of many, she went on to claim that Mr. Rosenzweig was "using government power to wage LAWFARE against MAGA patriots."  The post included photos of Mr. Rosenzweig receiving a DOJ award, a screenshot of his LinkedIn profile, and a call to "Fire him."  At the time of its last known publication, the post had been viewed approximately 1.5 million times.



38.     This post has since been deleted.

39.     The photo used in Ms. Winters's post above was a photo that USAO-SDFL itself had promoted on the office's social media page on September 21, 2021.  The photo depicted Mr. Rosenzweig receiving an award from the U.S. Postal Inspection Service for his work.  In the original post, DOJ extolled Mr. Rosenzweig's work, captioning the post "Congratulations AUSA Will Rosenzweig!" and praising his prosecution of "a series of cases involving the shipment of methamphetamine & other drugs through the U.S. Postal Service."

40.     Beneath her original post, Ms. Winters replied to her own post, continuing her "EXCLUSIVE" update.  In at least seven additional posts—all of which are now deleted—she quoted from Mr. Rosenzweig's blog and characterized his activity as "attacking President Trump and his administration."  She also "tagged" the official accounts of DOJ, then-Attorney General Bondi, then-Deputy Attorney General Blanche, DOJ official Ed Martin, and USAO-SDFL, imploring them to "[f]ire this rogue Trump hater."  At the time of the last known publication of that post, the post was viewed approximately 49,000 times.  Ms. Winters's "followers" include multiple DOJ current and former employees, including what appears to be the personal accounts of former Attorney General Bondi and DOJ official Ed Martin.[10]

41.     In another reply to her original post, Ms. Winters posted four screenshots of Mr. Rosenzweig's past writings, which she characterized as "vicious attacks on President Trump and his supporters."  Three of the screenshotted excerpts she selected to prove this point included one that criticized speeches given by then-President Barack Obama and actress Meryl Streep, and an opinion piece written by Mr. Rosenzweig that was not published on his blog but instead in the

---

[10] "Tagging" an individual in a social media post ensures that the "tagged" user will be notified of the post. X HELP CENTER, https://help.x.com/en/using-x/mentions-and-replies (last visited Aug. 5, 2026). A "follower" is a user who specifically subscribes to another user's social media posts, thereby prioritizing the "followed" user's posts in the "follower's" feed. X HELP CENTER, https://help.x.com/en/using-x/following-faqs (last visited Aug. 5, 2026).

16

media outlet *The Hill*.  The opinion piece in *The Hill* was published before Trump assumed the Presidency, on August 29, 2016, and, on information and belief, has been available publicly online since that date.[11]  The article contained his opinion that then-candidate Trump was a poor choice in the upcoming election.  The article was published several years before Mr. Rosenzweig applied to DOJ, and his DOJ application materials cited his prior publications.  He interviewed with and was ultimately hired by DOJ during the first Trump Administration.  *The Hill* article was nearly a decade old by the time Ms. Winters demanded Mr. Rosenzweig be fired for its publication.

42.     In her replies to her own post, Ms. Winters included other content from the blog. While legally irrelevant under the First Amendment and even under DOJ policy, *see infra* paragraph 56, it bears special mention that every excerpt Ms. Winters quoted in her now-deleted posts was derived from entries written when Mr. Rosenzweig was a private citizen.  Indeed, the excerpts selected by Ms. Winters—the posts of a United States citizen voicing criticisms of his government leaders—are textbook examples of when the First Amendment's protection of private citizens' speech is "at its zenith."  *Meyer v. Grant*, 486 U.S. 414, 425 (1988) (citation omitted). The Supreme Court has recognized that such speech "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  *Connick v. Myers*, 461 U.S. 138, 145 (1983) (internal quotation marks omitted).

43.     At 6:29 p.m. on the day of Ms. Winters's posts, DOJ sent an email to Mr. Rosenzweig's personal email account.  The subject line read, "AG Notification of Your Removal – Effective Immediately."  The email was sent from F. Michael Sena, Director, Human Resources, JMD.  Copied on the email were individuals named Valarie Mulcahy, Vu Nguyen, and Christine

---

[11] Will Rosenzweig, *Presidency Is About Much More Than the Future of the Supreme Court*, THE HILL (Aug. 29, 2016), https://thehill.com/blogs/congress-blog/judicial/293645-the-presidency-is-about-much-more-than-the-future-of-the-supreme/ (last visited Aug. 5, 2026).

E. Gunning, who appear to be JMD employees.  The body of the email informed Mr. Rosenzweig of his immediate termination.  *See* Exhibit 1.

44.     Attached to the email was a PDF memorandum titled "AG Memo – Rosenzweig Removal."  The metadata from the attached PDF indicates that it was created on September 23, 2025, at 6:19:14 p.m., and modified at 6:26:22 p.m., less than three hours after Ms. Winters's first post.  The memorandum reads as follows:

MEMORANDUM FOR WILL J. ROSENZWEIG

FROM: THE ATTORNEY GENERAL

Subject:        Notice of Removal from Federal Service

This memorandum provides official notice that you are removed from your position of Assistant U.S. Attorney, AD-0905-29, Criminal Division – Southern District of Florida, United States Attorney's Office, and from the federal service effective immediately.

Pursuant to Article II of the United States Constitution and the laws of the United States, your employment with the Department of Justice is hereby terminated, and you are removed from federal service effective immediately.

If applicable, you may have a right to file an appeal of this removal with the U.S. Merit Systems Protection Board (MSPB) within 30 days of the effective date of this removal action. For more information on how to file an appeal with the MSPB, please visit www.mspb.gov.

45.     The memorandum includes an ink signature of then-Attorney General Bondi and a handwritten date of "9/23/25."  It also includes a blank space apparently intended for Mr. Rosenzweig's signature, though he was never directed to sign or return the memorandum to anyone.  *See* Exhibit 2.  The correspondence contains no allegation of misconduct or other performance-based reason for his removal.  Thus, the Attorney General's memorandum does not represent that Mr. Rosenzweig's removal was "for cause."  Mr. Rosenzweig was given no advance notice of his termination and had no opportunity to contest or appeal the decision.

46.     The memorandum provides no definition for the term "federal service."

47.     At the time DOJ sent the email, Mr. Rosenzweig was still observing Rosh Hashanah and was not immediately aware of the email or his termination.  However, shortly after the email was sent, Mr. Rosenzweig noticed that his government phone had an error message on the screen that advised him to call the office.  The phone was otherwise nonfunctional.  Then, after powering on his personal phone, he received a text message from a concerned colleague a little before 8:00 p.m. alerting him to the X thread from Ms. Winters.  Shortly thereafter, Mr. Rosenzweig began receiving a flurry of concerned messages from friends and coworkers.

48.     Using his personal phone, Mr. Rosenzweig texted one of his supervisors asking for an explanation.  That person told Mr. Rosenzweig he would call another supervisor and ask that person for an explanation.  The second supervisor then called Mr. Rosenzweig and explained that United States Attorney Quiñones and the Office of the Deputy Attorney General ("ODAG"), then led by Defendant Todd Blanche, had discussed the matter of Mr. Rosenzweig's past blog posts earlier that day.  Mr. Rosenzweig took this to mean a discussion occurred between ODAG and Quiñones, who spoke on behalf of USAO-SDFL, about whether to fire him based on the substance of his past blog posts.  According to the supervisor, after the conversation between ODAG and USAO-SDFL, "then it spread to Twitter."

49.     The content of Mr. Rosenzweig's blog and the posts from the commentator, including the posts that tagged the official accounts of DOJ leadership, was collected from the internet.  On information and belief, the information transmitted to DOJ would have been received on a phone, computer, or other government device.  Thus, there should be records maintained of the information that prompted Mr. Rosenzweig's removal—his past blog posts and the commentator's social media posts—by virtue of DOJ's preservation of communications and

retention of files related to personnel decisions. Further, because Ms. Winters's writings existed online, Defendants' viewing of her social media posts and related content would appear in internet search histories and web histories of whatever devices were used to view the information. It is also likely that this information from social media and the blog posts was disseminated by DOJ officials internally in deciding about Mr. Rosenzweig's firing. For example, if ODAG and USAO-SDFL personnel communicated about the posts with each other or the Attorney General before she signed Mr. Rosenzweig's termination memorandum, it is likely they did so by sharing links to the posts on electronic devices.

50. Despite being the head of USAO-SDFL and entrusted with leadership of the office's personnel, United States Attorney Quiñones never contacted Mr. Rosenzweig to discuss his termination. Nor did he reach out to learn what, if anything, needed to be done about the upcoming *Kochen* case.

51. Had he ever spoken to Mr. Rosenzweig, he would have learned that approximately a decade prior to his firing, Mr. Rosenzweig began authoring a blog that included a variety of political commentary, including criticisms of President Trump during his first term. But far from being an "anti-Trump blog," as Ms. Winters described it, Mr. Rosenzweig had begun the blog in January 2016, prior to then-candidate Trump even becoming his political party's nominee for that year's presidential election. After a few years of posting publicly, Mr. Rosenzweig eventually set the blog's setting to "private," and by January 2019—months before he accepted a position with DOJ in the first Trump Administration in September 2019—it was effectively defunct. Indeed, it was nearly two years following his final post that Mr. Rosenzweig started working at DOJ, in September 2020, following DOJ's completion of a background check, its granting of his security clearance, and a delay related to the COVID-19 pandemic.

52.     During those three years when the blog was public, it is true that as a private citizen, Mr. Rosenzweig published criticisms of President Trump during his 2016 campaign and first presidential term. But that was far from the primary purpose of the blog. Titled "Hosts of Error," the blog's website included the following subtitle: "Commentaries on politics, law, and other things." The blog included a range of political commentary. For example, one post critiqued the political campaign of Democratic candidate Bernie Sanders, while another analyzed the drawbacks of potential Supreme Court nominations of then-President Barack Obama.

53.     Mr. Rosenzweig used his blog to comment on a host of apolitical, anodyne topics, including: college basketball and the annual "March Madness" tournament; the legacy of American baseball player Pete Rose; a trip to Napa Valley; a travel review of the Canadian city of Toronto; and an essay on air travel and flying. And while many of his past posts did include criticisms of Trump both as President and candidate, the quantity of these posts was largely a function of the blog being active during a time when Trump's actions were a central focus of then-current political events. Mr. Rosenzweig did not establish the blog with the intention of managing an "anti-Trump blog."

54.     Despite the variety of topics covered on the blog, Ms. Winters had either chosen herself, or had been provided by another person, only select portions of the blog which criticized President Trump to publish on her own social media page.

55.     Between 2016 and 2020, before ever accepting or beginning a job with DOJ, Mr. Rosenzweig was a private citizen with an undeniable First Amendment right to criticize his government. Every single one of his blog posts was protected by his unabridged constitutional right to freedom of speech. Further, as a line AUSA, Mr. Rosenzweig was not a political appointee, had no policymaking authority, and maintained a constitutional right to hold private, personal

opinions about his government leadership.  Regardless of his past or present thoughts about his past or present political leaders, Mr. Rosenzweig understood that his role as a federal prosecutor was apolitical and non-policymaking.  He performed his job without fear or favor in accordance with this understanding.  And as outlined above, he performed it with excellence, for which DOJ regularly recognized him.

56.     In addition, DOJ's guidance to its own employees is clear that they are allowed to engage in political speech, subject to some common-sense restrictions.  JMD informs DOJ employees that, "[f]ederal employees retain the right to have and express personal opinions about candidates, elections and political parties outside of the workplace, using their personal computers, phones, etc."[12]

57.     Furthermore, JMD advises that in many cases employees may "[w]rite a blog expressing support of or opposition to partisan political candidates or parties," as long as it is not done while on federal duty, in a federal facility, or does not use the employee's official federal title in the blog.  *Id.*  Mr. Rosenzweig's posts would have been consistent with DOJ policy on political speech had he made his blog posts during his federal employment as an AUSA, as long as they were made when he was off-duty on his own time.  But Mr. Rosenzweig did not blog after he was hired as an AUSA, and his prior posts were no longer public.  In retaliating against him, DOJ has violated its own stated policies on political speech by targeting speech it does not agree with made by a citizen years before federal employment.

58.     Yet upon his termination, Mr. Rosenzweig was immediately treated as if he had committed some form of serious misconduct.  Suddenly and unexpectedly locked out of his

---

[12] Justice Management Division, U.S. Dep't of Justice, *Political Activities*, https://www.justice.gov/jmd/political-activities (last visited on Aug. 5, 2026).

government phone and laptop, he had no way to transition any of his cases or dozens of open criminal investigations, including the impending *Kochen* trial. Other than one supervisor who had called at the behest of another, as described above, not a single person from USAO-SDFL's senior leadership called him to discuss his abrupt termination. Despite working at the office for five years and earning consistent praise and awards, his next official contact with anyone from USAO-SDFL was with a Human Resources ("HR") representative, who called him on September 24, 2025, to arrange for the return of his government-issued equipment and to schedule a time for him to collect his personal belongings from USAO-SDFL. The HR representative also informed him that he would not be allowed back inside the building or to clean out his office but would instead need to wait outside in the building's sally port, typically used for prisoners.[13]

59.     Mr. Rosenzweig and the HR representative agreed that Mr. Rosenzweig would return on the following Monday, September 29, 2025. That day, USAO-SDFL's head of security personally supervised him, maintaining visual oversight as he inspected his personal effects that had been boxed up by the office and delivered to him in the sally port. Mr. Rosenzweig returned his phone, laptop, and ID badge. One of the last items that Mr. Rosenzweig returned was his parking spot access card, a privilege that the prior United States Attorney had given him in recognition for his work just weeks earlier. He returned it to the same head of security who had assisted him with his new parking space. On information and belief, United States Attorney Quiñones would have been responsible for overseeing or otherwise authorizing the local implementation of Mr. Rosenzweig's summary termination.

60.     Mr. Rosenzweig later received an SF-50, Notification of Personnel Action, memorializing his termination. Section 5-D of the SF-50 is titled "Legal Authority." This section

---

[13] A sally port is a fortified entrance to a government building, used in high-security facilities.

states: ART II CONSTITUTION. Section 45 of Mr. Rosenzweig's SF-50 is titled "Remarks." This section states: REASON(S) FOR REMOVAL: ARTICLE II OF THE CONSTITUTION AND THE LAWS OF THE UNITED STATES. *See* Exhibit 3. Thus, according to his official personnel file, his firing was not "for cause."

61. In Section 5-D of the SF-50 memorializing Mr. Rosenzweig's appointment to DOJ, dated September 13, 2020, the "Legal Authority" states: "28 USC 542." This statute is not cited anywhere in Mr. Rosenzweig's termination letter or in the SF-50 memorializing his termination.

***DOJ creates more communications and records surrounding Mr. Rosenzweig's firing through its contact with third parties.***

62. On Wednesday, September 24, 2025, at approximately 7:53 a.m. and roughly 13 hours after his termination memorandum had been created, right-wing social media commentator Laura Loomer published a "SCOOP" on X, reposting Ms. Winters's claim. Laura Loomer, on information and belief, has political influence in the Trump Administration, including influence over the termination of federal employees.[14] She describes herself on her X account as an investigative journalist and she has been recognized by the Trump Administration as a member of the press.[15]

63. In her post, Ms. Loomer claimed to have received information directly from DOJ. Specifically, she stated, "SCOOP: DOJ sources tell me that Assistant US Attorney Will

---

[14] *See, e.g.,* Meg Kinnard, *More Trump Administration Figures Who Met Laura Loomer's Ire Are Out*, ASSOCIATED PRESS (Apr. 4, 2025), https://apnews.com/article/laura-loomer-trump-influence-appointees-fired-83ab8898477427da4dc1824c6ff3b560 (last visited Aug. 5, 2026); Tyler Pager & Maggie Haberman, *Laura Loomer, Trump's Blunt Instrument*, N.Y. TIMES (July 8, 2025), https://www.nytimes.com/2025/07/08/us/politics/laura-loomer-trump.html (last visited Aug. 5, 2026).

[15] David Bauder, *Conservative Activist Laura Loomer, A Trump Ally, Says She Has A New Pentagon Press Pass*, ASSOCIATED PRESS (Nov. 4, 2025), https://apnews.com/article/laura-loomer-pentagon-defense-credentials-reporting-media-ec785d0239e5e4b5c8144ff57011c5be (last visited Aug. 5, 2026).

Rosenzweig was FIRED yesterday after he was exposed for running an anti-Trump blog.  He was working in the Healthcare fraud unit at the DOJ in Miami, Florida."[16]  On information and belief, claiming an update is a "scoop" is similar to claiming something is "exclusive," in that it implies the information has only been provided to a specific media outlet or personality who can then be the first to report on the information.

64.     Ms. Loomer's post contained information that was not featured in any of Ms. Winters's posts.   Specifically, she wrote that Mr. Rosenzweig worked in USAO-SDFL's Healthcare Fraud Unit.  That level of detail about his DOJ employment—his exact unit within the Economic Crimes Section—was not available online.

65.     At the time of Ms. Loomer's 7:53 a.m. post, Mr. Rosenzweig had not publicized his firing with anyone outside of DOJ or his immediate family, having only learned of it less than 12 hours prior.  On information and belief, nobody with whom Mr. Rosenzweig discussed his firing has or had any connection to Laura Loomer and thus did not share news of his firing with her.  As of the date of this filing, Ms. Loomer's post remains publicly available on X and has been viewed nearly 600,000 times.  The link in Ms. Loomer's post to Ms. Winters's original post is no longer active, because Ms. Winters's post has since been deleted.  Where the original post would normally be linked is a message that says the "post is unavailable."

66.     At 8:51 a.m., Ms. Winters, in turn, reposted Ms. Loomer's 7:53 a.m. post, with a statement claiming responsibility for DOJ's termination of Mr. Rosenzweig, "Got this guy fired😎."  Ms. Loomer responded by posting an American flag icon.  At the time of its last known publication, the post was viewed approximately 12,000 times.

---

[16]Laura     Loomer     (@LauraLoomer),     X     (Sept.     24,     2025), https://x.com/LauraLoomer/status/1970818756298358835 (last visited Aug. 5, 2026).



67. This post has since been deleted.

68. At 9:27 p.m. on September 24, 2025, Ms. Winters again bragged about her influence with DOJ, publishing the following statement, reposting her original post, and "tagging" the official accounts of DOJ officials: "Let's give credit where it's due: thank you [then-Attorney General Pam Bondi] [then-Deputy Attorney General Todd Blanche] [Ed Martin] [U.S. Attorney's Office Southern District of Florida] for taking quick action and firing this guy as soon as I exposed his deranged anti-Trump blog. I'll have more reporting soon on the weaponization of [USAO-SDFL] during the Biden regime."



69.     This post has since been deleted.

70.     A few days after Mr. Rosenzweig's firing, on September 27, 2025, a group of former USAO-SDFL prosecutors wrote an article in the Miami Herald opposing recent summary firings of the district's federal prosecutors, including Mr. Rosenzweig's termination.[17]   On September 30, 2025, at 6:05 p.m., Ms. Winters responded to the article on her X account, labeling the authors "leftist political hacks pretending to be neutral."   After touting her actions preceding his firing, she again tagged then-Attorney General Bondi and the official account of USAO-SDFL, thanking Ms. Bondi for "terminat[ing] Rosenzweig before he could do any further damage."

71.     This post has since been deleted.

72.     In sum, DOJ appears to have provided information to Ms. Loomer that not only confirmed Mr. Rosenzweig's firing but also confirmed it was related to posts by Ms. Winters. Further, Ms. Winters publicly credited DOJ on multiple occasions for honoring her demands to

---

[17] Bruce L. Udolf, Marcos Daniel Jimenez, Jane Moscowitz & Caroline Miller, *Defending Integrity: Former Miami Federal Prosecutors Condemn Partisan Firings*, MIAMI HERALD (Sept. 27, 2025) https://www.miamiherald.com/opinion/op-ed/article312275256.html (last visited Aug. 5, 2026).

have Mr. Rosenzweig fired. DOJ has never disputed this claim, either directly or through proxies like Ms. Loomer. Because Ms. Winters tagged official DOJ accounts, on information and belief, a record of the accounts' social media activity will exist on the users' devices.

***USAO-SDFL scrambles to account for Mr. Rosenzweig's absence in the Kochen trial and admits its own actions have prejudiced a criminal case.***

73.     On Thursday, September 25, 2025, Mr. Rosenzweig's co-counsel and supervisor filed a motion on behalf of the United States, requesting that the district court continue the trial. The government wrote:

> On or about September 23, 2025, the lead prosecutor on this case was terminated from his employment with the United States Attorney's Office. As this Court is aware, this [sic] a very complex case involving over 40 government witnesses and over 400 potential government exhibits. The lead prosecutor, who indicted and is most knowledgeable of this case, prepared and is familiar with all of the discovery, and has been coordinating with all of the witnesses, was essential to the trial and is now no longer available to assist. While the government is in the process of bringing in additional AUSAs to help, given the complexity of the matter and the lead prosecutor's sudden and unforeseeable departure, they will require substantial additional time to get up to speed . . . The United States also requests a continuance of the *James* hearing, which was to be handled by the lead prosecutor.[18]

74.     On September 26, 2025, the district court heard argument on the motion to continue. During the hearing, the district court directly asked the government about the circumstances of Mr. Rosenzweig's firing. His co-counsel stated that "it came from Washington, D.C." In an apparent reference to the abnormal nature of the firing, the district court asked, "Does Washington, D.C., know that he was supposedly trying a five-week trial? Did they even consider that?" Government counsel responded that he did not know the answer.[19]

75.     The district court denied the motion.[20]

---

[18] *Kochen* at ECF No. 198.

[19] *Id*. at ECF No. 243.

[20] *Id*. at ECF No. 199.

76.     On September 30, 2025, the district court severed Marcelo Kochen's case from that of the other two defendants, citing concerns over his medical condition.[21]

77.     On October 2, 2025, the government moved for reconsideration of its previously denied motion to continue.  In support of its motion, remaining government counsel asserted that "[t]he government is without a lead counsel" and that Mr. Rosenzweig, who was "suddenly terminated," "was essential to the trial."  According to the filing, Mr. Rosenzweig's "knowledge of the case, the witnesses, and specifically the discovery cannot be replicated" in between his firing and the beginning of evidence.  The government cited "significant prejudice to the United States and to the public if it were forced to go forward with trial" in the wake of Mr. Rosenzweig's firing. Notably, the government argued that it "may recommend dismissal" of the criminal case against defendants Michael Kochen and Sandro Herek if the court denied its request for a continuance.[22] Outside of court, the unusual nature of Mr. Rosenzweig's firing and its consequent disruption to the case began to attract significant media attention.[23]

78.     The district court ultimately granted the government a brief continuance following jury selection, giving the prosecution until November 3, 2025, to attempt to compensate for Mr. Rosenzweig's absence.[24]  USAO-SDFL assigned not one, but two prosecutors to replace Mr.

---

[21] *Id*. at ECF No. 244.

[22] *Id*. at ECF No. 208.

[23] *See, e.g.*, Debra Cassens Weiss, *Florida Federal Prosecutor Fired After Old Alleged Anti-Trump Blog Posts Surface*, ABA JOURNAL (Oct. 1, 2025), https://www.abajournal.com/news/article/miami-federal-prosecutor-is-fired-after-old-anti-trump-blog-posts-surface (last visited Aug. 5, 2026); Jay Weaver, *Bondi's Firing of Federal Prosecutor in Miami Threatened to Derail Big Medicare Fraud Trial*, MIAMI HERALD (Oct. 3, 2025), https://www.miamiherald.com/news/politics-government/article312366679.html (last visited Aug. 5, 2026).

[24] *Kochen* at ECF No. 217.

Rosenzweig and restabilize the case.[25] On December 22, 2025, Michael Kochen and Sandro Herek were convicted on conspiracy charges, including conspiracy to commit health care fraud and conspiracy to pay and receive kickbacks, as well as substantive healthcare fraud and kickback charges, for their roles in the Medicare fraud scheme.[26] They have since been sentenced.[27] As of the date of this filing, the criminal case for the severed defendant, Marcelo Kochen, is pending.

79. As explained above, Quiñones did not interact with Mr. Rosenzweig on the date of his firing or anytime thereafter. He made no publicly known effort to intercede on his behalf, or to protect the government's interests in the *Kochen* case by preventing, delaying, or providing notice of Mr. Rosenzweig's firing. However, Quiñones did openly recognize how disruptive Mr. Rosenzweig's firing was to the government's case.

80. On January 15, 2026, a Miami-based legal blog published an article that cited a "number of sources inside the U.S. Attorney's Office for the Southern District of Florida."[28] The blog post outlined the details of a reportedly mandatory, all-hands meeting inside USAO-SDFL following the two *Kochen* defendants' convictions. According to the blog's "sources," Quiñones convened the meeting to recognize the prosecutors who took over the case after Mr. Rosenzweig's firing. Quiñones reportedly stated that defense counsel in the *Kochen* case had "unearthed" Mr.

---

[25] *Id*. at ECF Nos. 219, 220.

[26] USAO-SDFL, Press Release, *Two Healthcare Executives Convicted for Exploiting Elderly Medicare Advantage Beneficiaries in $34 Million Fraud Scheme* (Jan. 7, 2026), https://www.justice.gov/usao-sdfl/pr/two-healthcare-executives-convicted-exploiting-elderly-medicare-advantage (last visited Aug. 5, 2026).

[27] USAO-SDFL, Press Release, *Healthcare Executive and Telemarketing Company Owner Sentenced to Prison for Exploiting Elderly Medicare Advantage Beneficiaries in $35 Million Fraud Scheme* (July 30, 2026), https://www.justice.gov/usao-sdfl/pr/healthcare-executive-and-telemarketing-company-owner-sentenced-prison-exploiting (last visited Aug. 5, 2026).

[28] David Oscar Markus, *Hammer Time*, SOUTHERN DISTRICT OF FLORIDA BLOG (Jan. 15, 2026), https://sdfla.blogspot.com/2026/01/hammer-time.html (last visited Aug. 5, 2026).

Rosenzweig's old blog posts, and that their actions "'forced' the government's hand in firing [him]."[29] In his statements, Quiñones confirmed DOJ's knowledge of a connection between the *Kochen* defendants, Ms. Winters's X posts, and the apparent agreement of someone in DOJ to acquiesce to Ms. Winters's demands to fire Mr. Rosenzweig, even if it meant prejudicing a criminal case to the benefit of the *Kochen* defendants.

**The June 2008 OIG and OPR Report on Politicized Hiring and the Gerlich *Decision Put DOJ on Notice that it Cannot Use Information from the Internet to Divine Political Affiliation in Making Employment Decisions.***

81.     In June 2008, the Department's Office of the Inspector General ("OIG") and Office of Professional Responsibility ("OPR") issued a 115-page joint report titled, "An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program" (the "Report"). The Report found that DOJ officials had improperly considered the political and ideological affiliations of candidates for DOJ's career attorney positions, including by creating and using records of those affiliations gathered from internet searches, in violation of DOJ policy and federal law.[30]

82.     The Report became the basis for a lawsuit filed by DOJ applicants who had been removed from consideration for employment in the candidate pool because of the tainted politicized screening process. In that lawsuit, the Court of Appeals for the D.C. Circuit ruled that DOJ's creation and maintenance of records of applicants' political affiliations, including annotations and materials printed from the internet, stated a violation of the Privacy Act, 5 U.S.C.

---

[29] *Id*.

[30] Special Report, Department of Justice ("DOJ"), Office of the Inspector General & Office of Professional Responsibility, *An Investigation of Allegations of Politicized Hiring in the Department of Justice Honors Program and Summer Law Intern Program* (June 2008), https://oig.justice.gov/sites/default/files/archive/special/s0806/report.htm (last visited Aug. 5, 2026).

§ 552a(e)(7) and (e)(5), and that DOJ was subject to an adverse inference for having destroyed those records after litigation became reasonably foreseeable. *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 172 (D.C. Cir. 2013).

83.     DOJ has not forgotten that episode. DOJ's Office of Privacy and Civil Liberties published a guide titled, "Overview of the Privacy Act of 1974" (the "Guide"), which is available at: https://www.justice.gov/opcl/overview-privacy-act-1974-2020-edition.  The Guide, which was last revised in 2020, discusses the *Gerlich* case extensively, explaining that the case held that "plaintiff job applicants 'met their pleading burden' where they alleged that agency official 'conducted Internet searches regarding applicants' political and ideological affiliations' and 'either created printouts of such information or made written comments on the applications throughout the process concerning the liberal affiliations of candidates.'" *Id.* at 187.

84.     In addition, on information and belief, DOJ uses the OIG report and the *Gerlich* decision in training its supervisors and managers, instructing them that considering an individual's political affiliation or protected expression in career personnel decisions is unlawful.  DOJ was therefore not merely on notice that the conduct alleged here is prohibited; it has affirmatively trained its personnel that it is prohibited.  It acted intentionally and willfully in disregarding this knowledge.

***DOJ's removal of Mr. Rosenzweig was carried out pursuant to a stated policy of removing career personnel for their perceived political disloyalty and protected activity.***

85.     On January 20, 2025, the inauguration day for the second Trump Administration, the President issued Executive Order 14147, "Ending the Weaponization of the Federal Government."  The Order directed the Attorney General to review the activities of federal agencies, "including . . . the Department of Justice," over the preceding four years and to "identify any

32

instances" of conduct "contrary to the purposes and policies of this order."[31]  In practice, this has resulted in DOJ targeting individuals who previously worked on investigations adverse to President Trump or his political agenda.

86.     DOJ carried out that directive against its own career personnel.  Beginning in late January 2025, and pursuant to a memorandum stating that DOJ would not "tolerate subversive personnel actions by the previous Administration" and that "the appropriate course is to terminate these employees," DOJ—through then-Interim United States Attorney for the District of Columbia Ed Martin—removed dozens of prosecutors who had worked on prosecutions arising from the January 6, 2021 attack on the United States Capitol.[32]  A termination notice sent on January 27, 2025 to attorneys who had served on the former Special Counsel's team reportedly stated: "Given your significant role in prosecuting the President, I do not believe that the leadership of the Department can trust you to assist in implementing the President's agenda faithfully."[33]

87.     DOJ has fired scores of DOJ attorneys and FBI agents consistent with its stated policy of removing individuals who it perceives do not align with the incumbent party agenda.  In June 2025, then-Attorney General Bondi fired another three prosecutors connected to the January 6 prosecutions, sending termination letters that, like here, cited only "Article II of the United States

---

[31] Exec. Order No. 14147, *Ending the Weaponization of the Federal Government*, 90 Fed. Reg. 8235 (Jan. 20, 2025), https://www.federalregister.gov/documents/2025/01/28/2025-01900/ending-the-weaponization-of-the-federal-government (last visited Aug. 5, 2026).

[32] Kyle Cheney & Josh Gerstein, *DOJ Fires Dozens of Prosecutors Who Handled Jan. 6 Cases*, POLITICO (Jan. 31, 2025), https://www.politico.com/news/2025/01/31/doj-purges-prosecutors-january-6-cases-00201904 (last visited Aug. 5, 2026).

[33] Alexander Mallin, *DOJ Fires Members of Special Counsel Jack Smith Team Who Prosecuted Trump*, ABC NEWS (Jan. 27, 2025), https://abcnews.com/Politics/doj-fires-members-special-counsel-jack-smiths-team/story?id=118155822 (last visited Aug. 5, 2026)

Constitution and the laws of the United States," as the basis for their termination.[34]  At least 20 DOJ attorneys and FBI employees have been summarily fired for similar reasons.[35]

88.    During a television interview on March 3, 2025, then-Attorney General Bondi bragged, with respect to firing DOJ prosecutors: "[W]e got rid of the Jack Smith team. Gone. Those people are gone."[36]  She then revealed that such firings would continue, explaining that "[t]here are a lot of people in the FBI and also in the Department of Justice who despise Donald Trump, despise us, don't want to be here" and proclaiming, "right now, we're going to root them out; we will find them, and they will no longer be employed."[37]

89.    On March 26, 2026, then-Deputy Attorney General Todd Blanche was a featured guest at a political conference.[38]  Apparently speaking in his official capacity, Blanche boasted of the recent firings, claiming that "there is not a single man or woman at the Department of Justice who had anything to do with [the criminal prosecutions of then-citizen Trump]."[39]  When his

---

[34] Alanna Durkin Richer, *DOJ Abruptly Fires 3 Prosecutors Involved in Jan. 6 Criminal Cases, AP Sources Say*, PBS NEWSHOUR (June 28, 2025), https://www.pbs.org/newshour/politics/doj-abruptly-fires-3-prosecutors-involved-in-jan-6-criminal-cases-ap-sources-say (last visited Aug. 5, 2026).

[35] Jacob Rosen & Scott MacFarlane, J*ustice Department Purge Continues*, CBS NEWS (July 12, 2025), https://www.cbsnews.com/news/justice-department-firings-include-trump-investigators-jan-6-prosecutors (last visited Aug. 5, 2026).

[36] Fox News, *AG Pam Bondi on the Epstein Files: "The Public Has a Right to Know,"* HANNITY (Mar. 3, 2025), https://www.foxnews.com/video/6369576644112 (last visited Aug. 5, 2026).

[37] *Id.* at 6:45.

[38] Staff Writer, *Deputy Attorney General Todd Blanche to Join CPAC USA 2026*, CPAC (Mar. 3, 2026), https://www.cpac.org/post/deputy-attorney-general-todd-blanche-to-join-cpac-usa-2026 (last visited Aug. 5, 2026).

[39] Right Side Broadcasting Network, *Fireside Chat with Deputy Attorney General Todd Blanche at CPAC 2026*, (YouTube, Mar. 26, 2026), https://youtu.be/sYwQMhXAhCc?si=Rrk9mqgJGci7KOi9&t=209, at 3:32 (last visited Aug. 5, 2026).

interviewer asked how many employees "have been canned," Blanche responded, "over 200," citing resignations and terminations.[40]

90.   Former Attorney General Bondi, current Acting Attorney General Blanche, and DOJ employee Ed Martin are all "tagged" multiple times throughout Ms. Winters's posts. And, as described above, Ms. Winters's account is "followed" by the personal accounts of Ms. Bondi and Mr. Martin.

91.   Thus, DOJ's removal of Mr. Rosenzweig as a perceived political enemy of the incumbent political party was neither isolated nor inadvertent, but rather part of a wider campaign to conduct political firings. His firing was executed like the other firings: pursuant to a publicly announced program where DOJ has compiled records of the suspected political views, associations, and protected expression of career prosecutors and agents, and has used those records to remove them from federal service. Worse still, his firing was based on core protected speech and prompted by an uninformed social media post that Defendant Quiñones openly admitted was connected to criminal defendants in an active case. DOJ did so knowingly and deliberately, and with knowledge that political affiliation and protected speech are not lawful grounds for removal.

***Civil Service Protections for Assistant United States Attorneys***

92.   Positions for DOJ attorneys fall into two broad categories: political and career. It is not improper to consider political or ideological affiliations when hiring for DOJ political positions. However, both DOJ policy and civil service law prohibit discrimination in making employment decisions for DOJ career positions on the basis of political affiliations. Mr. Rosenzweig was hired as a career employee.

---

[40] *Id.* at 3:42.

93.     The Department's policy on nondiscrimination is contained in the Code of Federal Regulations, Section 42.1(a) of 28 C.F.R. Part 42, Subpart A, which states:

> It is the policy of the Department of Justice to seek to eliminate discrimination on the basis of race, color, religion, sex, sexual orientation, national origin, marital status, **political affiliation**, age, or physical or mental handicap in employment within the Department and to assure equal employment opportunity for all employees and applicants for employment (emphasis added).

94.     While the regulation does not define "political affiliation," courts have considered political affiliation to include "commonality of political purpose, partisan activity, and political support." *See, e.g., Curinga* v. *City of Clairton*, 357 F.3d 305, 311 (3d Cir. 2004).

95.     The DOJ's Equal Employment Opportunity Policy dated December 31, 2025, states:

> The Department remains steadfast in its commitment to equal employment opportunity (EEO) and treating employees with fairness, dignity and compassion. We must ensure that no applicant for employment or employee of our Department is denied equal opportunity because of race, color, religion, national origin, sex – including pregnancy – or because of age, physical or mental disability, protected genetic information, parental status, marital status, **political affiliation, or any other non-merit based factor and that all have the freedom to compete on a fair and level playing field. We also must protect our workforce and applicants from retaliation for participating in EEO activity or opposing discriminatory acts.** (emphasis added).

96.     Neither the President nor the Department of Justice has unlimited authority to remove Assistant United States Attorneys.  The Civil Service Reform Act of 1978, Pub. L. No. 95–454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C., and later amended in 1990), provides crucial guardrails that protect these federal employees from arbitrary or unlawful termination.

97.     Accordingly, the Government may not terminate federal employees like Mr. Rosenzweig unless doing so comports with statutorily defined "merit system principles" and does not constitute statutorily defined "prohibited personnel practices," and even then, the Government may terminate federal employees like Mr. Rosenzweig only after following established pre- and post-removal procedures.  5 U.S.C. §§ 2301, 2302(b).

98.     Defendant OPM is explicitly charged with administering the federal civil service, which encompasses all federal employees.  5 U.S.C. § 1103(a)(5).  OPM's duties include managing the federal work force consistent with the nine merit system principles, which dictate that all employees should receive, *inter alia*, "fair and equitable treatment . . . without regard to political affiliation . . . and with proper regard for their privacy and constitutional rights," and that personnel actions (including removals) must be based on merit and fitness, and must not be arbitrary, capricious, or discriminatory.  5 U.S.C. § 2301.  These principles explicitly require that "[e]mployees should be protected against arbitrary action, personal favoritism, or coercion for partisan political purposes."  *Id.* § 2301(b)(8)(A).  Relatedly, an agency may take major adverse "action" against an employee only "for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a).

99.     OPM also oversees conduct relating to the prohibited personnel practices as outlined in 5 U.S.C. § 2302(b).  These statutory prohibitions prevent agencies from taking, or failing to take, personnel actions against members of the civil service for certain reasons.  For example, agencies cannot "take, direct others to take, recommend, or approve any personnel action" that "discriminate[s] for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others," or "on the basis of their . . . political affiliation."  *Id.* §§ 2302(b)(10)

(prohibiting discrimination based on conduct not adversely affecting performance); 2302(b)(1)(E) (prohibiting discrimination based on protected characteristics, including political affiliation).

100.     Federal employees against whom an action—including removal—is proposed are also entitled to "at least 30 days' advance written notice" of the action, to "a reasonable time, but not less than 7 days, to answer orally and in writing," to "be represented by an attorney or other representative," and to "a written decision and the specific reasons therefor at the earliest practicable date."  5 U.S.C. § 7513(b).   Mr. Rosenzweig received none of these due process entitlements prior to his firing.

101.     The politically motivated termination of Mr. Rosenzweig—ostensibly under "Article II of the Constitution"—upends bedrock principles of our democracy and justice system. Civil servants like Mr. Rosenzweig are not political appointees; like all AUSAs, he must conduct his duties without fearing or favoring any political party or perspective, guided solely by the law, the facts, and the pursuit of justice.  Congress recognized this essential proposition and, pursuant to its Article I powers, enacted the CSRA to place guardrails on the removal of AUSAs and other federal employees and ensure continuity and impartiality in government service.  The Executive Branch cannot use Article II to overrule Congress and remove career civil servants for perceived disloyalty.  Such an act violates the Constitution's fundamental Separation of Powers and the Bill of Rights.

***The Merit Systems Protection Board***

102.     In a normal termination, Mr. Rosenzweig would be able to seek recourse through the Merit Systems Protection Board ("MSPB").  However, while Mr. Rosenzweig is a "covered employee" under the CSRA and entitled to its protections, an "Article II firing" is a new invention of the current DOJ.  DOJ and the CSRA's MSPB channeling provisions do not account for this new invention.

103.     The MSPB's appellate jurisdiction reaches only an action "taken under" 5 U.S.C. § 7513, that is, a removal for "such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a), (d).  District courts have held that Article II removals, like Mr. Rosenzweig's, are not executed under Section 7513.  The Attorney General's memorandum stated no cause and invoked only "Article II of the United States Constitution and the laws of the United States."  Because a removal not "taken under" Section 7513 is not an action the MSPB is empowered to review, it falls outside the CSRA's channeling provisions and within this Court's jurisdiction under 28 U.S.C. § 1331.  "[W]hen enacting the CSRA, Congress did not consider 'Article II removals' of career civil servants because they were not a thing." *Comans v. Exec. Off. of the President*, No. 1:25-CV-01237-MSN-WEF, 2026 WL 2100037, at *1 (E.D. Va. July 21, 2026) (citing *Comey v. U.S. Dep't of Justice*, No. 1:25-CV-7625 (JMF), 2026 WL 1142679, at *7 (S.D.N.Y. Apr. 28, 2026)).

104.     Defendants cannot have it both ways. Having told the MSPB that it lacks jurisdiction to adjudicate the legality of an Article II removal, Defendants cannot also contend that the same removal is channeled away from this Court and into the Board.  If both positions held, Mr. Rosenzweig would have no forum in which to obtain review of an admittedly unprecedented exercise of removal power.  Channeling that leaves a plaintiff with no forum forecloses all meaningful judicial review and confirms this Court's jurisdiction.

105.     In addition, any complaint filed before the MSPB would be futile and constitutionally unsound based on the current structure of the MSPB.[41]

---

[41] In an abundance of caution, and to preserve any applicable rights and remedies, Mr. Rosenzweig filed a timely appeal with the MSPB challenging his termination.  He has expressly reserved his right to pursue legal action in district court.  In any event, on August 5, 2026, his MSPB appeal was dismissed without prejudice amidst the structural and procedural upheaval caused by Article II firings.

106. The CSRA established the MSPB as an independent agency consisting of three members, each appointed by the President with the advice and consent of the Senate to serve seven-year terms. 5 U.S.C. §§ 1201, 1202(a)–(c). The MSPB is a quasi-judicial body, adjudicating conflicts between civil servants and their employing agencies. It was designed to resolve disputes including federal employees' allegations that their government employers discriminated against them, retaliated against them for whistleblowing, violated protections for veterans, or otherwise subjected them to an unlawful adverse employment action or prohibited personnel practice. 5 U.S.C. §§ 1204(a)(1), 1221, 2302(b)(1), (8)–(9), 3330a(d), 7512.

107. By statute, no more than two members of the MSPB are permitted to be from the same political party, to ensure that federal employees are "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." 5 U.S.C. §§ 1201, 2301(b)(8)(A). MSPB members serve seven-year terms. *Id.* § 1202(a). Senate consent is required for confirmation of any MSPB member. *Id*. § 1201.

108. Thus, an action to remove employees covered by the CSRA through a typical termination generally proceeds before the MSPB. *See* 5 U.S.C. §§ 7511–15. The statute provides that a covered employee "against whom an action is proposed is entitled to[:]" a minimum of "30 days' advance written notice[;]" the opportunity to respond orally and in writing; representation; and "a written decision and the specific reasons therefor at the earliest practicable date." *Id*. § 7513(b). Decisions are appealable, first to the MSPB and then in most cases to the United States Court of Appeals for the Federal Circuit. *See id.* § 7513(d). This integrated system presupposes the existence of a functioning, independent MSPB capable of providing meaningful review. It also presupposes that an employee is removed under a style of termination intended to be channeled to the MSPB.

109.     However, those presuppositions no longer hold.  An "Article II firing" is a novel form of firing, deployed for the very first time by the current DOJ.  Further, the MSPB currently does not function as intended.  Beginning in early 2025, a series of events fundamentally destabilized the MSPB's structure, undermining its independence, and rendered it incapable of providing effective relief in any case, and particularly in a case involving an Article II firing.

110.     On February 10, 2025, President Trump terminated MSPB member Cathy Harris approximately three years before the expiration of her statutory term.[42]  Her removal immediately disrupted the MSPB's bipartisan structure and called into question the enforceability of the statutory tenure protections Congress had enacted to ensure the Board's independence.  On March 4, 2025, the U.S. District Court for the District of Columbia held that Ms. Harris's removal was illegal and issued a permanent injunction that permitted Ms. Harris to return to her MSPB position.[43]  But on April 9, 2025, the U.S. Supreme Court blocked Ms. Harris's reinstatement while litigation continued[44] and on May 22, 2025, stayed the district court's order enjoining the President's removal.[45]  On June 30, 2026, following its decision in *Trump v. Slaughter*, 146 S. Ct. 2283 (2026), the Supreme Court denied Harris's petition for certiorari. *Harris v. Bessent*, No. 25-1110, 2026 WL 1871323 (U.S. June 30, 2026).

111.     Meanwhile, on February 28, 2025, MSPB member Raymond Limon retired, leaving the Board with Henry Kerner as its single remaining member.  From that point forward,

---

[42] Tom Jackman, *Federal Judge Rules Trump's Firing of Merit Board Chair was Illegal*, THE WASHINGTON POST (Mar. 4, 2025), https://www.washingtonpost.com/dc-md-va/2025/03/04/trump-firing-cathy-harris-mspb-illegal/ (last visited Aug. 5, 2026).

[43] *Harris v. Bessent*, 775 F. Supp. 3d 164, 170 (D.D.C. 2025).

[44] *Trump v. Wilcox*, No. 24A966, 2025 WL 1063917, at *1 (U.S. Apr. 9, 2025).

[45] *Trump v. Wilcox*, 145 S. Ct. 1415, 1416-17 (2025).

the MSPB lacked a quorum and was unable to issue final decisions in cases before it.  In practical terms, the Board was rendered functionally incapacitated.

112.    The Board's quorum requirement, once a safeguard for deliberative and bipartisan decision making, has itself become a mechanism of control.  Because the MSPB may act only with a quorum of two members, the asserted power to remove members at will enables the President to disable the Board simply by removing or declining to replace its members.  In this way, the MSPB's ability to function now depends on presidential indulgence.

113.    Although the Senate later confirmed James Woodruff to the MSPB on October 7, 2025, restoring a nominal quorum alongside Henry Kerner, the Board's statutory design was not restored.  Both remaining members are affiliated with the same political party, effectively nullifying Congress's requirement of bipartisan representation and further undermining MSPB's structural independence.  The Supreme Court has now denied review of Cathy Harris's challenge to this course of events.  In other words, the Board is permanently changed.  Following the Supreme Court's ruling in *Slaughter*, leadership at the MSPB has directed staff to stop describing the board as "independent."[46]

114.    The asserted scope of presidential control extends beyond MSPB members to the adjudicators who conduct hearings and issue initial decisions.  The Executive Branch has taken the position that statutory protections limiting the removal of administrative judges are unconstitutional and has declined to defend those protections in court.  *See* Letter from Sarah M. Harris, Acting Solicitor Gen., to Hon. Charles E. Grassley, Chairman, S. Comm. on the Judiciary

---

[46] Drew Friedman, *After Slaughter Decision, MSPB No Longer Calling Itself "Independent,"* FEDERAL NEWS NETWORK (July 21, 2026), https://federalnewsnetwork.com/management/2026/07/after-slaughter-decision-mspb-no-longer-calling-itself-independent/ (last visited Aug. 5, 2026).

(Feb. 20, 2025) ("the Department of Justice has concluded that the multiple layers of removal restrictions for administrative law judges (ALJs) in 5 U.S.C. 1202(d) and 7521(a) violate the Constitution, that the Department will no longer defend them in court, and that the Department has taken that position in ongoing litigation").

115.    At the same time, the Executive Branch has taken positions that further erode the MSPB's authority.  On information and belief, the Government itself previously argued before the MSPB that the CSRA is unconstitutional with regard to Article II firings, because the for-cause removal protections it affords violate the President's alleged Article II prerogatives, and that the MSPB does not have the jurisdiction to adjudicate the legality of the Government's actions in "Article II firings."

116.    The Office of Legal Counsel ("OLC") of the DOJ has compounded this instability. On September 26, 2025, OLC reversed course and published an opinion for the Counsel to the President, stating that "MSPB administrative judges are empowered and obligated to consider constitutional issues raised by Agencies during these proceedings."[47]  The opinion reasoned that "[t]o adjudicate all material issues in a given case, as required by the Act and the MSPB's regulations, the Board must decide any given constitutional issue that is material to the employing agency's decision."[48]

117.    And DOJ has argued that the MSPB is legally obligated to follow interpretations of the OLC, a position that would subject MSPB's legal interpretations of civil service law to OLC control.  The agency argues that the OLC opinion is the legal position of the Executive Branch and

---

[47] Office of Legal Counsel, DOJ, Memorandum Opinion for the Counsel to the President, *The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions Within an Administrative Proceeding* (Sept. 26, 2025), https://www.justice.gov/olc/media/1415466/dl (last visited Aug. 5, 2026).

[48] *Id.*

thus is binding upon the Board. *Jackler & Jaroch Consolidation v. Dep't of Justice*, 2026 M.S.P.B. 3, ¶ 12, 2026 WL 789485, at \*4 (Mar. 20, 2026) (initial hearing en banc ordered sub nom. *Jackler v. Dep't of Justice*, No. 2026-1575, 2026 WL 1740454 (Fed. Cir. June 17, 2026)). That position is reinforced by Executive Order 14215, which provides that "[t]he President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties," including those within independent agencies.[49] The Government continues to argue the position that independent agencies no longer exist. Under this framework, MSPB adjudicators may not adopt legal interpretations that conflict with the Executive Branch's position, collapsing the Board's adjudicatory function into the chain of command whose actions it is tasked with reviewing.

118. The MSPB's own precedent, however, reflects a more limited and internally inconsistent view of its constitutional authority. The Board has long held that it does not have the authority to adjudicate facial challenges to statutes or to the constitutionality of its own existence. *Davis-Clewis v. Dep't of Veterans Affs.*, 2024 M.S.P.B. 5, ¶ 9 (M.S.P.B. 2024); *Malone v. Dep't of Justice*, 14 M.S.P.R. 403, 406 (M.S.P.B. 1983). At the same time, the MSPB recently concluded that it may adjudicate certain as-applied constitutional challenges in the course of determining its own jurisdiction. *Jackler & Jaroch*, 2026 M.S.P.B. 3, ¶¶ 10, 18, 2026 WL 789485, at \*3-\*4. There, the Board reasoned that where an agency does not seek to invalidate a statute wholesale, but instead argues that the statute cannot constitutionally be applied to the appellants before it, the constitutional issue may be considered as part of the Board's threshold jurisdictional analysis.

---

[49] Exec. Order No. 14215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10447 §§ 1, 2(b), 5, 7 (Feb. 18, 2025), https://www.federalregister.gov/documents/2025/02/24/2025-03063/ensuring-accountability-for-all-agencies (last visited Aug. 5, 2026).

119.     This distinction underscores the Board's jurisdictional uncertainty and doctrinal fragmentation.   Under the MSPB's current approach, its authority to resolve constitutional questions turns on difficult and often indeterminate distinctions between facial and as-applied challenges, as well as on whether the issue is framed as jurisdictional.

120.     These developments have produced a system that is both structurally impaired and jurisdictionally unstable.  The MSPB's independence has been eroded through the removal of its members and the collapse of its bipartisan structure, while its ability to adjudicate claims now depends on shifting and internally inconsistent doctrines regarding the scope of its own authority. Taken together, these conditions leave litigants without a clear, reliable, or independent forum for resolution of their claims.

121.     To be clear, Mr. Rosenzweig disputes that the Constitution authorizes the President or the Attorney General to ignore or disobey the civil service laws passed by Congress and signed into law by former Presidents.   But at present, the United States not only disputes the constitutionality of the MSPB and CSRA, but took action to render the MSPB ineffective for its original congressional intent, including: (a) by removing the member of the MSPB necessary to ensure a quorum existed, (b) removing the one member who was from a political party other than the President's, and (c) replacing that member with someone from the same political party as the President.  Under these circumstances, requiring Plaintiff to proceed before the MSPB would force him to submit his claims to a tribunal that is, at once, structurally compromised, unable to provide meaningful review of an Article II firing, and subject to the control of the very Executive Branch whose actions are at issue.

122.     As of the date of this filing, multiple district courts have concluded that an "Article II firing" is properly in the province of an Article III court under 28 U.S.C. § 1331.

**CAUSES OF ACTION**

**COUNT ONE**
**VIOLATION OF THE FIRST AMENDMENT OF THE U.S. CONSTITUTION**
**(Retaliation for Protected Speech and Perceived Political Affiliation)**
**(Against All Defendants)**

123.     Paragraphs 1 through 122 are incorporated and realleged as if fully set forth herein.

124.     Plaintiff has a constitutional right to free speech and free association under the First Amendment of the United States Constitution.  Plaintiff exercised those rights when, as a private citizen prior to and during the first Trump Administration, he published comments critical of then-candidate and later President Trump on an online blog.

125.     Defendants violated Plaintiff's constitutionally protected rights by terminating him because of his exercise of this protected speech, or because of his presumed political affiliation and beliefs associated with that speech, or both.

126.     At all relevant times, Mr. Rosenzweig held no policymaking or confidential position.  He set no DOJ policy and he made no decision for which political affiliation was an appropriate requirement.  His role was to prosecute individual cases under the law, without regard to party, and his significant decisions required approval from a chain of supervisors.  Party affiliation was not an appropriate requirement for the effective performance of his position.  *See Elrod v. Burns*, 427 U.S. 347, 372-73 (1976); *Branti v. Finkel*, 445 U.S. 507, 519-20 (1980) (a public employee may not be discharged on the basis of political affiliation unless party affiliation is an appropriate requirement for the effective performance of the office).

127.     Mr. Rosenzweig published the blog posts as a private citizen, before he joined DOJ, and his commentary addressed matters of public concern.  He did not make them pursuant to any official duty.  Defendants terminated him because of that protected speech, or because of the political affiliation and beliefs they perceived from it, or both.  Defendants have identified no

46

disruption to DOJ's operations caused by the speech, and none occurred. Defendants took these actions knowing that removing a career employee on the basis of protected political speech and perceived political affiliation is unlawful, as DOJ's own OIG and OPR had found and as a federal appellate court has explained.

128.    Plaintiff has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.  As such, he is entitled to declaratory relief, reinstatement, an award of backpay, and any other available damages.

**COUNT TWO**
**VIOLATION OF THE SEPARATION OF POWERS**
**(Against All Defendants)**

129.    Paragraphs 1 through 122 are incorporated and realleged as if fully set forth herein.

130.    The removal of Mr. Rosenzweig "[p]ursuant to Article II of the Constitution and the laws of the United States" is invalid.

131.    *First*, Article II of the Constitution provides authority for the President, and the President alone, to appoint principal officers, concomitant with the power to remove them at will. Mr. Rosenzweig was not a principal officer, and neither the Department of Justice nor Ms. Bondi—who signed the termination memorandum—is the President.

132.    *Second*, under Article I, Section 8, of the Constitution, Congress has the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof," and under Article II, Section 2, "Congress may by Law vest the Appointment of []inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  The Constitution thus empowers Congress to regulate and restrict the removal of inferior officers and federal employees. *See United States v. Perkins*, 116 U.S. 483, 485 (1886) ("We have no doubt that when Congress, by law, vests the

47

appointment of inferior officers in the heads of Departments it may limit and restrict the power of removal as it deems best for the public interest."); *Myers v. United States*, 272 U.S. 52, 127 (1926) (citing *Perkins* and observing Congress's "power to limit and regulate removal" of inferior officers appointed by a department head empowered by Congress under Article II); *id*. at 161 (again citing *Perkins* and acknowledging Congress's ability to "restrict[] [department heads] in the exercise of the power of removal"); *id*. at 162 (noting "the evil of political executive removals of inferior offices" can be remedied by Congress).

133.    Congress has exercised this power by creating the Civil Service Reform Act, protecting civil servants like Mr. Rosenzweig from arbitrary, politically motivated removal. Defendants' removal of Mr. Rosenzweig under a purported Article II authority thus violates authorities vested in Congress by Articles I and II of the Constitution, including the power to place limitations on the removal of inferior officers and federal employees without due process or without cause.

134.    Defendants violated the separation of powers by asserting through their actions that a purported summary removal authority under Article II of the Constitution vitiates long-recognized statutory law.

135.    Mr. Rosenzweig was not a principal officer or political appointee. He was an employee or, at most, an inferior officer, though the latter status is undermined by DOJ's own position that Mr. Rosenzweig's most senior supervisor at SDFL—the United States Attorney—is an inferior officer. In any event, Congress may restrict the removal of such inferior officers and employees, and it did so through the Civil Service Reform Act. Even assuming the President or a department head held some authority to remove Mr. Rosenzweig, a power to remove is not

authority to remove him for an unlawful reason, in retaliation for protected speech, or in disregard of the for-cause protections enacted by Congress.

136.     Plaintiff has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.  As such, he is entitled to declaratory relief, reinstatement, an award of backpay, and any other available damages.

## COUNT THREE
### VIOLATION OF THE PRIVACY ACT
### (5 U.S.C. §§ 552a(e)(5) and (e)(7))
### (Against Defendant United States Department of Justice)

137.     Paragraphs 1 through 122 are incorporated and realleged as if fully set forth herein.

138.     Subsection (e)(7) of the Privacy Act mandates that an agency "maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity."   5 U.S.C. § 552a(e)(7).

139.     With regard to § 552a(e)(7) violations, the Privacy Act permits an individual to file suit when an agency "fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual." 5 U.S.C. § 552a(g)(1)(D).

140.     Subsection (e)(5) of the Privacy Act also requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination."   5 U.S.C. § 552a(e)(5).   Section 552a(g)(1)(C), in turn, provides a civil remedy if an agency fails to satisfy the standard in subsection (e)(5), and applies

49

to any record, and not only any record within a system of records. *See Gerlich*, 711 F.3d at 168–69.

141.    The Privacy Act creates a cause of action for violations of § 552a(e)(5) whereby "the individual may bring a civil action against the agency" when it "fails to maintain any record concerning any individual with such accuracy, relevance, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, or opportunities of, or benefits to the individual that may be made on the basis of such record, and consequently a determination is made which is adverse to the individual."   5 U.S.C. § 552a(g)(1)(C).

142.    Additionally, the Privacy Act allows plaintiffs to seek money damages in lawsuits brought under § 552a(g)(1)(C) or (g)(1)(D) when "the agency acted in a manner which was intentional or willful." 5 U.S.C. § 552a(g)(4).

143.    Before he joined DOJ, and as a private citizen, Mr. Rosenzweig published commentary on matters of public concern, including comments critical of then-candidate and later President Trump.  That commentary was activity protected by the First Amendment, and he did not publish it pursuant to any official duty.

144.    On information and belief, in connection with Mr. Rosenzweig's removal, DOJ maintained, used, created, compiled, disseminated, or collected one or more records describing that First Amendment activity and the political views DOJ perceived from it, including material gathered from the internet, communications transmitting that material to DOJ decisionmakers, and derogatory information associated with the decision to remove him.  Evidence of those records will be contained in e-mails, internet search histories, printouts, official social media accounts of

DOJ and its personnel, and text messages, including through commercial apps such as Signal, WhatsApp, and iMessages.

145.    DOJ's creation and maintenance of any such record was not authorized by statute, was not authorized by Mr. Rosenzweig, and was not within the scope of any authorized law enforcement activity.  Mr. Rosenzweig's blog posts were pre-employment, off-duty, personal political speech.  The posts were not the subject of, and did not relate to, any investigation of a past, present, or anticipated violation of any law the DOJ is authorized to enforce.

146.    DOJ relied on that record in deciding to remove Mr. Rosenzweig.  Its maintenance and use of the record proximately caused a determination adverse to him, namely his summary removal from federal service.  5 U.S.C. § 552a(g)(1)(C), (D).

147.    To the extent DOJ used records concerning Mr. Rosenzweig in making the removal determination, it failed to maintain those records with the accuracy, relevance, timeliness, and completeness necessary to assure fairness.  The records recast constitutionally protected speech as a permissible ground for removal, and to the extent they imputed disloyalty, misconduct, or unfitness to Mr. Rosenzweig, they were inaccurate and incomplete.  5 U.S.C. § 552a(e)(5).

148.    DOJ's liability under the Privacy Act arises from its own collection and use of information describing Mr. Rosenzweig's protected speech, and not from the existence of any third party's social-media post or account.  When DOJ officials received the information describing his blog and the political views, captured and transmitted that information to Department decisionmakers, and used it as the basis for his removal, DOJ collected, maintained, disseminated, and used a record describing how Mr. Rosenzweig exercised his rights under the First Amendment.  5 U.S.C. § 552a(a)(3) (defining "maintain" to include "maintain, collect, use, or disseminate"), (a)(4), (e)(7).

51

149.    DOJ acted intentionally or willfully.  It maintained and used the record deliberately, and as the basis for Mr. Rosenzweig's removal, in disregard of the plain requirements and prohibitions of Sections 552a(e)(5) and (e)(7).  DOJ has long been on notice that compiling and acting on records of the political views and protected expression of its personnel, including information collected from the internet, violates federal law.  As alleged above, DOJ's own OIG found this practice unlawful, a federal court held the same practice actionable under this statute, and the Department has trained its managers accordingly. In addition, DOJ maintained a stated policy of targeting for termination those it perceived to be disloyal to the President.

150.    As a direct and proximate result of DOJ's violations, Mr. Rosenzweig suffered an adverse effect and actual damages that are pecuniary in nature, including lost salary, lost health and retirement benefits, and out-of-pocket expenses incurred in seeking other employment.  He is entitled to recover his actual damages, and in no event less than the sum of $1,000, together with the costs of the action and reasonable attorney's fees. 5 U.S.C. § 552a(g)(4).

**COUNT FOUR**
**VIOLATION OF THE FIFTH AMENDMENT**
**(Procedural Due Process for a Protected Property Interest)**
**(Against All Defendants)**

151.    Paragraphs 1 through 122 are incorporated and realleged as if fully set forth herein.

152.    Plaintiff has a protected property interest in his continued employment with the DOJ under the Fifth Amendment of the United States Constitution based both on statutory removal protections under the CSRA and on rules and understandings fostered by Defendants throughout his employment.

153.    Mr. Rosenzweig's SF-50 identifies his tenure as "Permanent" and his position as within the "Excepted Service," and it reflects more than five years of continuous federal service. By statute, by regulation, and under DOJ's own rules and practices, a permanent excepted-service

52

employee who has completed the trial period may be removed only for cause, and would enjoy a certain level of protection from other types of removals such as reductions in force.  That for-cause protection is a legitimate claim of entitlement and a constitutionally protected property interest in his continued employment.  A property interest in continued public employment arises where "existing rules or understandings" permit removal only for cause; such a rule gives the employee a "legitimate claim of entitlement" that the Fifth Amendment protects.  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

154.    The Civil Service Reform Act supplies the standard and the process applicable to Section 542(b). As amended by the Civil Service Due Process Amendments of 1990, the Act extends its for-cause and procedural protections to an individual in the excepted service, other than a preference eligible, who is not serving a probationary or trial period or who has completed two years of current continuous service in the same or similar positions.  5 U.S.C. § 7511(a)(1)(C).  Mr. Rosenzweig satisfied that definition.

155.    Consistent with this reading, the MSPB has held that 28 U.S.C. § 542 does not remove AUSAs from the coverage of 5 U.S.C. § 7511(a)(1)(C), so an AUSA who meets that provision may appeal an adverse action, including a removal, to the Board.  *Hamlett v. Dep't of Justice*, 90 M.S.P.R. 674, 680 (M.S.P.B. 2002).  And a district court has ruled that the CSRA's for-cause removal provision itself "vests [a civil servant] with a due process property interest in [his] continued federal employment," reasoning that applies equally to § 7513(a), the excepted-service analog.  *Comans v. Exec. Off. of the President*, No. 1:25-cv-01237, 2026 WL 1132803, at *3 & *5 n.2 (E.D. Va. Apr. 15, 2026) (citation omitted).

156.    Defendants also fostered rules and understandings which created a mutual expectation of continued employment.  For example, Mr. Rosenzweig became eligible for FERS

benefits after five years, which undercuts any suggestion that line AUSAs are political appointees to be removed after every four-year presidential term.  Moreover, Mr. Rosenzweig consistently received excellent performance reviews and understood that the only way he could be removed for his job would be for cause, based on his conduct and performance.  Defendants did not remove Mr. Rosenzweig for cause.  His removal was not based on any conduct or job performance of his, and it did not promote the efficiency of the service.  Defendants' actions to terminate Plaintiff without due process unlawfully deprived him of his property interest in his job.

157.    Plaintiff has suffered adverse and harmful effects from the deprivation of his property interest in his employment, including, but not limited to, loss of income and lost or jeopardized present or future financial opportunities and reputational harm.  As such, he is entitled to declaratory relief, reinstatement, an award of backpay, and any other available damages.

**COUNT FIVE**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**(*Ultra Vires* and in Violation of 5 U.S.C. §§ 706(1) and 706(2))**
**(Against All Defendants)**

158.    Paragraphs 1 through 122 are incorporated and realleged as if fully set forth herein.

159.    Defendants, in authorizing and signing termination memorandum on September 23, 2025, unlawfully withheld the due process owed to Plaintiff, and implemented a final agency decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "unsupported by substantial evidence," and/or "unwarranted by the facts." 5 U.S.C. § 706.   The removal was also carried out pursuant to a practice that the DOJ's own OIG and a federal court had already found unlawful, and was therefore not in accordance with law.

54

160.    Defendants had no lawful authority to terminate Plaintiff from federal service without adhering to the statutory protections afforded to him through the CSRA.  His termination was therefore *ultra vires* and without legal force or effect.

161.    Because Defendants removed Mr. Rosenzweig without the authority conferred by the Civil Service Reform Act, and in excess of any lawful authority, their action was ultra vires and beyond the powers delegated to them. Mr. Rosenzweig is entitled to non-statutory review of, and equitable relief from, that ultra vires action, including a declaration that the removal was invalid and an order restoring him to his position.

162.    Plaintiff has suffered adverse and harmful effects, including, but not limited to, lost or jeopardized present or future financial opportunities and reputational harm.  As such, he is entitled to reinstatement, an award of backpay, and any other available damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Will Rosenzweig respectfully requests the following relief, including requests for declaratory relief made pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202:

a.    A declaration that Defendants violated the Separation of Powers and that their reliance on a purported Article II removal authority was invalid and order for appropriate relief;

b.    A declaration that Defendants violated Plaintiff's First Amendment rights and order for appropriate relief;

c.    A declaration that Defendants violated Plaintiff's Fifth Amendment rights and order for appropriate relief;

d.    A declaration that Defendants violated the Administrative Procedure Act;

e.      An order requiring Defendants to immediately reinstate Plaintiff and enjoin Defendants from taking any further adverse personnel action against Plaintiff without providing due process as required by law including the CSRA and the Fifth Amendment;

f.      A declaration that Defendant the United States Department of Justice violated the Privacy Act, 5 U.S.C. § 552a, an award of Plaintiff's actual damages in an amount to be proven at trial and in no event less than $1,000, and an award of the costs of the action and reasonable attorney's fees under 5 U.S.C. § 552a(g)(4);

g.      An award of backpay and other monetary and administrative relief as appropriate, under the Back Pay Act, 5 U.S.C. § 5596;

h.      An award of the costs of this action and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, the Back Pay Act, 5 U.S.C. § 5596(b)(1)(A)(ii), or any other applicable law; and

i.      A grant of any other further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on any issues so triable.

Dated: August 7, 2026                              Respectfully Submitted,

*/s/ Margaret M. Donovan*
Margaret M. Donovan
(*pro hac vice forthcoming*)
KOSKOFF KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com


*/s/ Daniel Fridman*
Daniel Fridman
Fla. Bar No. 176478
Adam S. Fels
Fla. Bar No. 114917
FRIDMAN FELS & SOTO, PLLC
150 Alhambra Circle, Suite 715
Coral Gables, FL 33134
Tel: (305) 569-7701
daniel.fridman@ffslawfirm.com
afels@ffslawfirm.com

*Attorneys for Plaintiff Will Rosenzweig*